757 F.2d 662
 MISSISSIPPI RIVER TRANSMISSION CORP., Plaintiff-Appellee
Cross-Appellant,
v.
George S. TABOR and 401 Acres More or Less, Situated in
Section 5 and 8, Township 19, North, Range 1 West,
Lincoln Parish, Louisiana,
Defendant-Appellant Cross-Appellee.
 No. 83-4569.
 United States Court of Appeals,
Fifth Circuit.
 April 15, 1985.
 
 Stephen R. Burke, James M. Johnson, Minden, La., David F. Post, Farmerville, La., for defendant-appellant cross-appellee.
 Burt W. Sperry, George Wear, Jr., James H. Napper, II, Monroe, La., for plaintiff-appellee cross-appellant.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before WISDOM, RANDALL, and JOLLY, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This appeal arises from a judgment ordering that the defendant's property rights in four tracts of land in Lincoln Parish, Louisiana be expropriated, in accordance with La.Rev.Stat.Ann. Secs. 19:1, 19:2, 19:2.1 (West 1979)[1] and 15 U.S.C. Sec. 717f(h) (1982),[2] for continued use by the plaintiff as a gas storage reservoir upon the plaintiff's payment to the defendant of just compensation for the rights so expropriated. On appeal, this court is asked to determine whether, under Louisiana law,[3] the defendant owned a compensable property right that required expropriation, whether the amount of compensation awarded by the district court was just compensation for the rights expropriated, and whether the defendant's cross-claim for damages for trespass and for the plaintiff's unlawful use of his property right before it was legally expropriated had prescribed. We agree with the trial judge's resolution of these issues and affirm the judgment of the district court.
 
 I.
 
 2
 The parties to this litigation have stipulated to most of the pertinent facts underlying this dispute. The plaintiff, Mississippi River Transmission Corporation (MRT), is engaged in the transportation of natural gas in interstate commerce and the distribution of natural gas to the public. Since May 2, 1973, MRT has been operating a natural gas storage reservoir in an underground geological formation known as the Vaughn Sand (Eastern Reservoir) in the Cotton Valley Formation, Unionville Field, Lincoln Parish, Louisiana.[4] MRT holds a certificate of public convenience and necessity from the Federal Power Commission[5] for the operation of the reservoir, and the Department of Conservation of the State of Louisiana has issued all of the necessary orders establishing and enabling MRT to operate the reservoir.[6]
 
 
 3
 On August 8, 1972, MRT acquired an Option and Gas Storage Agreement for the East Unionville Storage Reservoir from George B. Tabor (Tabor Sr.) according to which Tabor Sr. purported to grant to MRT, upon the payment of the compensation listed in the contract, all rights in the Tabor property located in the area of the Unionville storage reservoir necessary for MRT's operation of the reservoir.[7] MRT exercised its rights under the option agreement after the Department of Conservation approved the creation of the reservoir. Because of an error in a title opinion on the property, MRT failed to discover that George S. Tabor (Tabor Jr.) owned a partial interest in the property made subject to the gas storage agreement; therefore, MRT's agreement with Tabor Sr. did not contain a reference to Tabor Jr.'s interest.
 
 
 4
 At the time of the execution of the gas storage agreement between Tabor Sr. and MRT in 1972, Tabor Jr. owned the following interests in three of the four tracts of land included in the storage agreement:
 
 
 5
 (1) An undivided one-half ( 1/2 ) interest in the mineral rights in tract one, subject to an oil, gas, and mineral lease providing for a one-eighth ( 1/8 ) royalty on that portion of tract one located in the Calhoun Unit No. One created by the Louisiana Department of Conservation;
 
 
 6
 (2) An undivided one-half ( 1/2 ) interest in full ownership in tract two (including surface and mineral rights);
 
 
 7
 (3) An undivided one-half ( 1/2 ) interest in the mineral rights in tract four.
 
 
 8
 Tabor Sr. had the full ownership of tract three and he owned the remaining interest in tracts one, two, and four. On the death of Tabor Sr. in 1977 and a voluntary partition of his estate between his heirs, Tabor Jr. acquired full ownership of both the surface and mineral rights in all four tracts. Tabor Jr. became aware of the activities being conducted by MRT on the property in 1978, and negotiations for the settlement of this dispute began shortly thereafter.
 
 
 9
 MRT brought this action for declaratory judgment under 28 U.S.C. Secs. 2201 & 2202 to determine whether, at the time suit was filed, the defendant, Tabor Jr., owned any compensable interest in the four tracts of land made the subject of the storage agreement between MRT and Tabor Sr. MRT filed an alternative action under La.Rev.Stat.Ann. Secs. 19:1 & 19:2[8] and 15 U.S.C. Sec. 717f(h) (1982)[9] seeking to expropriate, through the exercise of the power of eminent domain, any such interest the defendant may have upon payment of just compensation at an amount fixed by the court. Tabor Jr. filed a counter-claim in which he sought damages, under a theory of trespass, and compensation for the lawful expropriation of his property. In its answer to Tabor Jr.'s counter-claim, MRT alleged that Tabor Jr.'s mineral interest in the subject property was extinguished by confusion in 1977, that MRT thereby acquired all rights in the property, and that Tabor Jr.'s claims for damages prescribed in 1979. MRT's complaint was later amended to add the Farmerville Bank, which held a mortgage on the defendant's property.
 
 
 10
 Before trial, Tabor Jr. dropped his damage claims for decreased value of the surface lands and for lowering of the water table in his lands. The parties stipulated to the value of any storage rights that Tabor Jr. may have had. The Farmerville Bank admitted MRT's right to acquire any necessary storage rights through the exercise of the power of eminent domain but claimed entitlement to any just compensation that might be awarded.
 
 
 11
 The district court held that Tabor Jr.'s claims for damages for the public use of his property had prescribed and that Tabor Jr. was not entitled to any damages for trespass. The court rejected MRT's contention that Tabor Jr.'s claim for compensation had also prescribed and awarded Tabor his proportionate share of the value of the recoverable reserves in the reservoir at the time of the creation of the reservoir. The court further ordered that Tabor Jr.'s interest be expropriated for continued use as a gas storage reservoir and fixed the amount of just compensation owed Tabor Jr. by MRT. The question of apportionment of the just compensation between the defendant and the Farmerville Bank was reserved for future amicable resolution or further court proceedings.
 
 
 12
 Both MRT and Tabor appeal. Tabor contends on appeal that the district court erred in its valuation of the recoverable reserves in the Vaughn Sand subject to Tabor Jr.'s mineral interest and in its refusal to award damages and attorney's fees to the defendant. MRT argues on appeal that the district court erred in holding that MRT did not already own all of the mineral rights in the subject property, therefore making expropriation unnecessary, and that Tabor Jr. was not bound to deliver his mineral rights to MRT in 1977 in accordance with the warranty clause contained in the agreement between MRT and Tabor Sr. We hold that the district court correctly resolved each of these disputed issues.
 
 II.
 
 13
 MRT contends that the district court erred in declining to grant a judgment in favor of MRT declaring that Tabor Jr. had no compensable right in the property nor any actionable claims for damages that had not prescribed. The district court held that Tabor Jr. did have an interest in the property requiring expropriation. The court further held that Tabor's claims for damages incidental to MRT's taking of the property in 1973 had prescribed two years after the first occurrence of any damage after completion of the reservoir, in accordance with La.Rev.Stat.Ann. Sec. 9:5624 (West 1979), but that if Tabor had a valid claim for damages in trespass for the taking itself or for just compensation in accordance with La.Rev.Stat.Ann. Sec. 19:2.1(B) (West 1979), such claims remained actionable. On appeal, MRT reasserts its contention that all of Tabor's claims for damages and rights to compensation for his interest in the four tracts of land prescribed in 1979, two years after Tabor's mineral servitude was extinguished by confusion. Tabor contends that the court erred in declining to award him damages in tort for mental anguish, humiliation, and embarrassment.
 
 
 14
 The trial court correctly analyzed the Louisiana law on the effect of prescription on the defendant's right to claim damages and just compensation. La.Rev.Stat.Ann. Sec. 19:2.1(B) (West 1979) provides:
 
 
 15
 "All claims for property by, or for damages to the owner caused by the expropriation of property pursuant to R.S. 19:2 [providing for expropriation by the state and certain private corporations] shall be barred by the prescription of two years commencing on the date on which the property was actually occupied and used for the purposes of expropriation."
 
 
 16
 Id. The prescriptive period provided by this section applies only to actions for damages and claims resulting from a legal expropriation. Greater Baton Rouge Airport District v. Hays, La.Ct.App. 1 Cir.1976, 339 So.2d 431, writ denied, 1977, 341 So.2d 403; A.K. Roy, Inc. v. Board of Commissioners, 1959, 237 La. 541, 111 So.2d 765. Therefore, the district court correctly held that Tabor's claim for compensation for the expropriation of his property rights did not begin to prescribe until the district court entered judgment legally expropriating Tabor Jr.'s rights in the four tracts of land.[10]
 
 
 17
 The district court held, however, that Tabor Jr.'s claims for trespass damages, other than those for the actual taking, and for damages incidental to the public use had prescribed in accordance with La.Rev.Stat.Ann. Sec. 9:5624 (West 1983). This section provides that "[w]hen private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run when the damages are sustained". Id.
 
 
 18
 Section 9:5624 contains the applicable prescriptive period for any and all actions for damages to private property for public purposes. Boudreaux v. Terrebonne Parish Police Jury, La.Ct.App. 1 Cir.1982, 422 So.2d 1209, 1213. This period runs from the first occurrence of any damage after the completion of the public works. Boudreaux, id., citing Nuckolls v. Louisiana State Highway Department, La.Ct.App. 2 Cir.1976, 337 So.2d 313, 315. Prescription does not run anew from each separate damage, Nuckolls, 337 So.2d at 315, nor is prescription interrupted under a theory of continuing trespass, Boudreaux, 422 So.2d at 1213. Therefore, MRT's continued use of the gas storage reservoir, which allegedly caused continuing damages to Tabor Jr., did not suspend the commencement of the prescriptive period, interrupt the running of prescription, or cause it to run anew from each separate use. The district court correctly held, therefore, that Tabor Jr.'s claims for damages incidental to the taking of his property for use as a gas storage reservoir had prescribed.
 
 
 19
 The Boudreaux court specifically noted that the two year prescriptive period set forth in section 9:5624 did not apply "to claims for compensation for the value of property, and for severance damages for the taking or use of property pursuant to an expropriation, an appropriation, or a St. Julien servitude". 422 So.2d at 1213 n. 7 (citations omitted). Moreover, as noted above, the prescriptive period of section 19:2.1(B) does not commence to run until after a legal expropriation. Thus, MRT can prevail in its contention that all of Tabor Jr.'s claims have prescribed only if it is correct in its assertion that all of Tabor Jr.'s compensable interests in the property were extinguished by confusion in 1977 and that, thereafter, his only remedy was a claim for damages for MRT's wrongful exercise of the mineral servitude from 1973 to 1977. This claim, MRT contends, was subject to the prescriptive period of section 9:5624 and, therefore, prescribed in 1979. We reject this contention for the reasons stated below.
 
 III.
 
 20
 MRT alleged, and the district court so found, that Tabor Jr.'s mineral servitude was extinguished by confusion in 1977, when Tabor Jr. inherited from his father the remaining ownership interests in the land. This point is not disputed. The dispute arises as to the effect of this extinguishment. MRT contends that once Tabor Jr.'s mineral servitude was extinguished, he lost any independent mineral interests in the property. Because Tabor Jr.'s independent mineral rights no longer existed, and because the remaining interests in the property were subject to the gas storage agreement between MRT and Tabor Sr., Tabor Jr. ceased to own any interest that required compensation in 1977. At that point, Tabor Jr.'s potential claim was converted from one for just compensation for property legally expropriated for public use to one for damages incidental to the public use from 1973 through 1977. This claim prescribed in two years in accordance with the provisions of La.Rev.Stat. Sec. 9:5624 as interpreted by the Boudreaux court.
 
 
 21
 The district court properly rejected this argument. The court recognized that Tabor Jr.'s mineral servitude was extinguished in 1977 when Tabor Jr. became the owner of both the servitude and the surface rights. See Mire v. Chevron Oil Co., La.Ct.App. 3 Cir.1977, 353 So.2d 462, 466, writ denied, 1978, 355 So.2d 256. The district court analogized the effect of the extinction of the mineral servitude to the extinction of a servitude by non-use for ten years. It is well established under Louisiana law that when a mineral servitude is extinguished by the prescription for non-use, the interest inures to the benefit of the surface landowner at the time the servitude is extinguished and not to a putative purchaser of the minerals from a non-owner. McMurrey v. Gray, 1949, 216 La. 904, 45 So.2d 73, 75; McDonald v. Richard, 1943, 203 La. 155, 13 So.2d 712, 714. Any purported sale of the mineral interest by a non-owner is null, La.Civ.Code Ann. art. 2452, and the later extinction of the independent mineral interest will vest ownership in the putative purchaser only if that purchaser is the owner of the surface rights when the servitude is extinguished.[11] This follows because "the burden or obligation of a servitude is imposed only upon the land, and not upon any person; so that when the obligation is extinguished the extinguishment of it necessarily inures to the owner of the land at the time of the extinguishment". Ohio Oil Co. v. Ferguson, 1946, 213 La. 183, 34 So.2d 746, 756.
 
 
 22
 In the instant case, Tabor Sr. purported to sell to MRT the exclusive right to inject, store, and remove minerals in the ground underlying four tracts of land. At the time this agreement became effective, Tabor Jr. owned an undivided one-half interest in the minerals in two of those tracts, and a one-half interest in full ownership in another tract. To the extent of Tabor Jr.'s ownership, Tabor Sr.'s sale to MRT of the exclusive rights in the subsurface property was null. Upon Tabor Sr.'s death and Tabor Jr.'s succession to his father's estate, Tabor Jr. became the surface owner of all four tracts; therefore, at that time his mineral servitude in those tracts was extinguished. This unencumbered ownership interest reverted to Tabor Jr. as the surface owner, and not to MRT as the putative purchaser of Tabor Jr.'s interest from Tabor Sr., a non-owner. Thus, at the time this suit was filed in 1981, Tabor Jr. was still the owner of an unencumbered and compensable interest that required expropriation.
 
 
 23
 Nor would extinction of the separate mineral right deprive Tabor Jr. of the right to assert an action in tort, under a trespass theory, for any property actually taken before the property was legally expropriated. Thus, if MRT's removal of gases and liquid hydrocarbons contained within the property that was subject to Tabor Jr.'s mineral servitude does constitute a trespass or tortious taking, the extinction of the servitude does not commence the running of the prescriptive period on an action in trespass. This prescriptive period would run from the date that Tabor Jr. became aware of any such taking. La.Rev.Code art. 3493 (West Supp.1984) (formerly codified at La.Civ.Code of 1870 art. 3537(3)). The Louisiana jurisprudence is conflicting as to the effect of a continuing trespass on the running of prescription. See Boudreaux, 422 So.2d at 1213 and cases cited therein. Because we determine in section V of this opinion that Tabor Jr. is entitled to the same amount of compensation under a trespass theory or an action for just compensation for the legal expropriation of his property for public purposes, we need not unravel this jurisprudence to determine whether any of his trespass claims for damages for the actual taking of his property have prescribed.
 
 IV.
 
 24
 The 1972 agreement between Tabor Sr. and MRT required Tabor Sr. to "warrant and agree to defend the title" to the land described in the agreement. The warranty clause excepted, however, any "valid recorded oil, gas and mineral leases, easements, servitudes and surface leases and other encumbrances as may be outstanding against said land at the time of the execution [of the storage agreement]". MRT asserts that Tabor Jr. became bound by the warranty clause in the agreement between Tabor Sr. and MRT once Tabor Jr. unconditionally accepted his father's succession. MRT concedes that the warranty clause excepted mineral servitudes of record and did not, therefore, apply to Tabor Jr.'s recorded mineral servitude. This servitude was extinguished, however, when Tabor Jr. succeeded to his father's ownership interests. MRT argues that the extinguishment of Tabor Jr.'s mineral servitude and the alleged consequent loss of his right to compensation for the expropriation of that separate interest satisfied Tabor's obligation of warranty to MRT.
 
 
 25
 MRT is, of course, correct in its contention that an heir who unconditionally accepts the succession of a decedent is liable for the debts and obligations of the decedent, including the obligations of warranty of title. See Robinson v. Dunson, La.Ct.App. 1 Cir.1953, 65 So.2d 643, 645; Griffing v. Taft, 1922, 51 La. 442, 91 So. 832. Because Tabor Jr. unconditionally accepted his father's succession, he succeeded to the obligations of his father's estate and was required to honor the warranty agreement to the extent that Tabor Sr. would have been required to honor it. However, Tabor Sr. could not sell Tabor Jr.'s interest, and the warranty specifically excluded all interests, such as Tabor Jr.'s, that were in effect and recorded as of the date that the agreement became effective--that is, as of 1973; therefore, Tabor Sr.'s warranty did not apply to Tabor Jr.'s interest.
 
 
 26
 Tabor Jr. could not succeed to an obligation that was never imposed upon his father or upon his father's estate. That Tabor Jr. became full owner of all of the property made subject to the gas storage agreement after he accepted his father's succession cannot have the effect of extending to Tabor Jr. an obligation to which he has not succeeded. Although it is uncontroverted that Tabor Jr.'s independent mineral servitude was extinguished when he became the owner of both the surface and mineral rights, this extinction had no effect on the obligations of Tabor Sr. or his estate. Because Tabor Sr.'s warranty did not apply to Tabor Jr.'s recorded mineral interest, Tabor Jr., who stands in the shoes of his father as to the debts and credits of his father's estate, La.Civ.Code Ann. arts. 1424 & 1425 (West 1952), is not liable to MRT.
 
 V.
 
 27
 The major issue left for us to consider is the amount of compensation to which Tabor Jr. is entitled. In cases in which a pipeline company must expropriate property for the creation of a gas storage reservoir, "[c]ompensation is payable for the value of the recoverable natural gas and condensate remaining in the reservoir, the value of the underground storage right, and the value of the servitude rights on the surface". Southern Natural Gas Co. v. Poland, La.Ct.App. 2 Cir.1981, 406 So.2d 657, 663, writ denied, 412 So.2d 86, cert. denied, 1982, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73. The surface owner owns the right to use the surface lands and the reservoir underlying the land for storage purposes and must be compensated for the expropriation of these rights. Southern Natural Gas Co. v. Sutton, La.Ct.App. 2 Cir.1981, 406 So.2d 669, 671, writ denied, 1982, 412 So.2d 86; Southern Natural Gas v. Poland, 406 So.2d at 663-64, 666. A mineral servitude owner or co-owner enjoys the "right to participate in the production of the remaining recoverable natural gas and condensate in the reservoir...." Poland, 406 So.2d at 666, and must be compensated for the expropriation of this right.
 
 
 28
 At the time that Tabor Sr. and MRT entered into the gas storage agreement affecting the four tracts of Tabor land, Tabor Jr. owned an undivided one-half mineral interest in tracts one and four and an undivided one-half interest in full ownership in tract two. As full owner in indivision of tract two, he is entitled to compensation for any expropriation of his storage and surface rights in this tract. The parties stipulated before trial that the value of Tabor Jr.'s storage rights in tract two totaled $771.15. The parties also agreed that there were no facilities built on the surface of the lands that were not fully covered by the agreement between Tabor Sr. and MRT. We have held that all of Tabor Jr.'s claims for incidental damages have prescribed. The only issue remaining as to the compensation due Tabor Jr. for the expropriation, then, is the quantum and value of the commercially recoverable reserves in the reservoir for which he is entitled to compensation as owner of an unencumbered mineral interest in the property.
 
 
 29
 Tabor Jr. also seeks damages or compensation for MRT's tortious taking of the minerals subject to his mineral servitude from 1973 to the present.[12] He claims compensation not only for the expropriation itself, but also for the value of the minerals actually taken. We reject this claim for two reasons. First, it is doubtful that any trespass occurred. As surface owner, Tabor Sr. was authorized to grant MRT the right to enter upon his land, make constructions on the land for the operation of the pipeline, and use the underground strata for storage purposes. Poland, 406 So.2d at 666. The only limitation upon this right is that Tabor Jr., as one-half mineral servitude owner, was entitled to one-half of the revenues generated from the production of minerals in that strata, subject to any mineral leases Tabor Jr. had granted. See Cox v. Sanders, La.1982, 421 So.2d 869, 872;[13] Starr Davis Oil Co. v. Webber, 1950, 218 La. 231, 48 So.2d 906, 908. We believe, therefore, that Tabor Jr. has failed to prove that there was any trespass in the instant case.
 
 
 30
 Second, we reject Tabor Jr.'s claims for additional taking damages under a trespass theory because if, in fact, a trespass was committed, it entitles the defendant to no additional compensation. Once the Louisiana Department of Conservation issued its order authorizing the construction of the East Unionville Storage Area, production in the Vaughn Sand within the storage area was forever halted;[14] Tabor Jr.'s sole right as a mineral servitude owner from that point forward, therefore, was the right to have his mineral interests legally expropriated and to receive just compensation for the recoverable reserves in the reservoir. The measure of just and adequate compensation to which Tabor Jr. is entitled under Article 1, Sec. 4 of the Louisiana Constitution of 1974[15] (previously Article 1, Sec. 2 of the Louisiana Constitution of 1921), and La.Rev.Stat.Ann. Sec. 19:9 (West 1979)[16] "is to be estimated by the same standard whether the property taken is formally expropriated in accordance with law or appropriated by the condemning authority so long as it is intentionally taken for a public use". Gray v. State Through Department of Highways, 1967, 250 La. 1045, 202 So.2d 24, 26. The Gray court stated:
 
 
 31
 "[I]t makes no difference in determining the amount to be awarded that the property was appropriated and not formally expropriated. Albeit in appropriation cases the condemning authority does not obey the mandate of the law that the compensation be paid before the taking, the noncompliance of this condition precedent to the condemnation does not subject the appropriator to a penalty, for when the owner recovers just compensation, he recovers all the law gives him. To hold otherwise would be to inflict punitive damages upon the condemnor which is not permissible under our civil law system."
 
 
 32
 Id., 202 So.2d at 30. The district court was correct, therefore, in its conclusion that under either a trespass or expropriation theory, the compensation due Tabor Jr. is the same: He is entitled to be compensated for one-half the value of the recoverable reserves in the reservoir at the time of the creation of the storage facility, subject to the provisions of the mineral lease on the property at that time.
 
 
 33
 The district court was required to determine the volume of recoverable reserves and the value of those reserves based upon the expert testimony presented at trial. These factual determinations should not be reversed in the absence of manifest error. Greater Baton Rouge Airport District v. Hays, La.Ct.App. 1st Cir.1976, 339 So.2d 431, 436, writ denied, 1977, 341 So.2d 403. Both experts based their valuations on the number of acres of land subject to Tabor Jr.'s mineral servitude in 1972 and 1973 that fell within the zero sand isopach of the Vaughn Sand in the Unionville Field in Lincoln Parish. The zero sand isopach is a theoretical line that identifies the productive limits of a particular sand in a producing area. Tracts two, three, and four of the Tabor land fell outside of the zero sand isopach--that is, they were outside of the limits of the productive sand; therefore, as both experts agreed, there were no recoverable reserves underlying these tracts. Of the approximately 346.85 acres in tract one, approximately 161.79 acres were within the zero sand isopach. The disputed questions as to the quantum of recoverable reserves in tract one, then, are whether the entire acreage in tract one within the zero sand isopach should be included in the calculation of recoverable reserves for which Tabor Jr. is entitled to compensation and what bottom hole abandonment pressure[17] should be used in that calculation.
 
 
 34
 The plaintiff's expert, Mr. Waterman, made a study of the zero sand isopach of the East Unionville Field before the storage reservoir was created to determine the amount of gas in place in that substrata. Mr. Waterman also testified before the Louisiana Department of Conservation in 1972 concerning the recoverable reserves in the area of the projected gas storage reservoir. His findings were adopted by the Commission. Mr. Waterman concluded that the only acreage containing recoverable reserves in tract one of the Tabor lands were the 30.155 acres included in the production unit for the Calhoun Well--the only producing well in the area at the time the reservoir was created. This conclusion was based upon Waterman's opinion that any other reserves within the zero sand isopach were not commercially producible because the cost of production would exceed the profits derived from any such production. He further concluded that, considering the costs of production, it would be economically infeasible to attempt production below a bottom hole pressure of 250 pounds per square inch (p.s.i.).
 
 
 35
 Tabor Jr.'s expert, Mr. McCarter, based his opinions on the geological information presented at the Department of Conservation hearings and on Mr. Waterman's calculations. Unlike Mr. Waterman, however, Mr. McCarter included in his calculations the entire 161.79 acres of tract one within the zero sand isopach. He also calculated the amount of recoverable reserves down to an abandonment bottom hole pressure of 125 p.s.i. Mr. McCarter testified that he thought that production down to a bottom hole pressure of 125 was possible, but stated that he did not consider the increased costs of production to the lower bottom hole pressure in determining abandonment pressure.
 
 
 36
 The district court relied on Mr. Waterman's calculations in determining the amount of recoverable reserves in tract one. The court noted that Mr. Waterman based his calculation on a first-hand evaluation of the area before the reservoir was created and that he took into account the increased costs of production outside of the Calhoun well and at bottom hole pressures below 250 p.s.i. in determining what reserves within the zero sand isopach were commercially recoverable. For these reasons, the district court found that Mr. Waterman's figures more closely reflected the quantum of recoverable reserves underlying tract one than did Mr. McCarter's figures. In this expropriation proceeding, the trial court "is granted much discretion in weighing the testimony of experts, and his finding of value based upon such evidence will not be disturbed unless clearly erroneous". Pointe Coupee Electric Membership Corporation v. Mounger, La.Ct.App. 1 Cir.1984, 447 So.2d 1104, 1109-10 (citations omitted). The district court's finding as to the amount of recoverable reserves is substantiated by the record; accordingly, we affirm.
 
 
 37
 The court also correctly adopted Mr. Waterman's valuation of the recoverable reserves. On appeal, Tabor Jr. contends that the district court erred in valuing the recoverable reserves according to their 1972 value instead of the value at the time the expropriation of the Tabor Jr.'s land was ordered in 1983. Generally, "the time for the determination of market value is the date of the institution of the expropriation proceeding". M. Dakin v. M. Klein, Eminent Domain in Louisiana (An Analysis of Expropriation Law and Practice) 162 (1970). Similarly, in cases in which the property is appropriated without the property owner's knowledge "thus precluding his consent to the taking ..., but he later discovers the fact and asserts his ownership soon after the discovery, the compensation due the landowner shall be the market value of the property as of the date that the taker claims the property under its expropriation power". Id. at 165.
 
 
 38
 Applying this analysis to the instant case, the recoverable reserves underlying tract one of the Tabor property would be valued as of 1981 when this suit was filed. However, the determination of the amount that will fully compensate a property owner for the value of property expropriated "must be made on the basis of the facts of each case and in accordance with the uniqueness of the thing taken". Trunkline Gas Co. v. Rawls, La.Ct.App. 2 Cir.1981, 394 So.2d 1250, 1252 (citations omitted). In the unique circumstances of this case, the value of the recoverable minerals within the Vaughn Sand was fixed by the Federal Power Commission in its order dated July 5, 1973, which authorized the creation of the gas storage reservoir. That order provided that MRT was to purchase the gas remaining in the field, which at that time was dedicated to Texas Eastern Transmission Corporation, at a rate of 18.3 cents per Mcf. Federal Power Commission Findings and Order in Docket Nos. CP73-130, CI 67-1830 & CI 67-1832, and CI 73-624 at p. 3 (July 5, 1973). By supplemental order of the Louisiana Department of Conservation dated July 10, 1973, MRT's underground storage unit was declared operational and all existing production units in the Vaughn Sand (Eastern Reservoir) were dissolved and declared to be null and void.[18] Accordingly, all natural gas within the area of the storage reservoir was declared to be the property of MRT and all production in that field ceased. In accordance with these orders, therefore, the value of recoverable reserves within the Vaughn Sand (Eastern Reservoir) was fixed at 18.3 cents per Mcf, and the district court correctly used this figure in valuing Tabor Jr.'s compensable mineral interest.[19] We therefore hold that the district court's valuation of the property expropriated from Tabor Jr. was correct and affirm this award.
 
 VI.
 
 39
 Tabor Jr. asserts on appeal that he is entitled to an award of attorney's fees in accordance with La.Rev.Stat.Ann. Sec. 19:8 (West 1979). The statute provides that after the amount of compensation due in an expropriation suit has been decided, "the plaintiff shall, upon motion of the defendant, present evidence as to the highest amount it offered the defendant for the property prior to trial on the merits". Id. The trial judge will then determine the highest amount offered. "If the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees." Id.
 
 
 40
 If the highest amount offered the defendant is presented at trial, the defendant need not make a motion to have such evidence admitted. Pointe Coupee Electric Membership Corp. v. Mounger, La.Ct.App. 1 Cir.1984, 447 So.2d 1104, 1112. Although this evidence was not submitted at trial, Tabor admitted in his Proposed Conclusions of Law and Fact that MRT offered him $3,000.00 to settle the entire controversy. The trial court awarded just compensation to Tabor in the amount of $1,242.40, with legal interest thereon of $1,537.21, for a total award of $2,779.61. Because this amount does not exceed the highest amount offered by MRT, Tabor Jr. is not entitled to an award of attorney's fees under section 19:8. See Shell Pipe Line Corporation v. Sarver, La.Ct.App. 3 Cir.1983, 442 So.2d 884, 886, writ denied, 1984, 446 So.2d 319.
 
 VII.
 
 41
 The district court correctly resolved the legal issues presented on this appeal in accordance with Louisiana law. MRT's argument that Tabor Jr.'s compensable interest in the four tracts of land subject to his father's agreement with MRT had terminated before this suit was filed is incorrect as a matter of law. The extinction of Tabor Jr.'s mineral servitude by confusion in 1977 did not have the effect of subjecting his unencumbered mineral interest to the storage agreement. Tabor Jr. retained a compensable interest that required expropriation in accordance with the state's power of eminent domain. Tabor's right to claim just compensation for this interest does not prescribe until two years from the date of the judgment of the district court. Nor did the provisions of the warranty clause contained in the storage agreement bar Tabor Jr. from claiming just compensation for his unencumbered interest.
 
 
 42
 Tabor Jr. was entitled to be compensated to the full extent of his loss in accordance with the Louisiana Constitution and expropriation statutes. Tabor Jr. received compensation for the storage rights in tract two of the subject property and for his unencumbered interest in tract one, the only tract that contained recoverable reserves. The district court's valuation of these reserves was substantiated by the record. We therefore AFFIRM the judgment of the district court ordering that Tabor Jr.'s compensable interest in his four tracts of land in Lincoln Parish, Louisiana be expropriated for continued use as a gas storage reservoir upon MRT's payment of just compensation to Tabor Jr. in the amount of $1,242.40 plus legal interest thereon. The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 La.Rev.Stat.Ann. Sec. 19:2(5) (West 1979) provides, in pertinent part, that "[a]ny domestic or foreign corporation created for the piping and marketing of natural gas for the purposes of supplying the public with natural gas" may expropriate needed property, when a price cannot be agreed upon with the owner of the property. The term "property", as used in the statute, is defined as "immovable property", including servitudes and other rights in or to immovable property". La.Rev.Stat.Ann. Sec. 19:1 (West 1979)
 
 
 [2]
 This statute provides:
 When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.
 15 U.S.C. Sec. 717f(h) (1982) (emphasis in the original).
 
 
 [3]
 15 U.S.C. Sec. 717f(h) requires that the practice and procedure in federal expropriation proceedings conform as nearly as possible with the practice and procedure to be followed in a state court action in the state where the property being expropriated is situated. See note 2. Therefore, Louisiana law controls the issues in this case
 
 
 [4]
 The Louisiana Department of Conservation (now the Louisiana Office of Conservation) specifically delimited the area comprising the Vaughn Sand in its order creating the storage area operated by MRT as follows:
 "The Vaughn Sand, Unionville Field, Lincoln Parish, Louisiana, has been defined in the 206 Series of Department of Conservation Order 206-B-1 as being that gas and condensate bearing sand encountered between the depths of 8725 feet and 8750 feet (electrical log measurements) in the Southwest Gas Producing Company--J.W. Thurman # 1 Well, located in the northeast quarter of the southwest quarter of Section 4, Township 19 North, Range 2 West, Lincoln Parish, Louisiana and is hereby further defined as being that gas and condensate bearing sand encountered between the depths of 8943 feet and 8968 feet in the Southwest Gas Producing Company--No. 1 J. Franklin Well, located in Section 10, Township 19 North, Range 2 West."
 State of Louisiana, Department of Conservation, Order No. 206-B-2, Order Concerning the Application of Mississippi River Transmission Corporation for Creation of a Storage Reservoir and for Regulations Governing the Injection, Storage, and Withdrawal of Gas from the Vaughn Sand (Eastern Reservoir) in the Unionville Field, Lincoln Parish, Louisiana (December 21, 1972) (hereinafter Conservation Order).
 
 
 [5]
 The Federal Power Commission (now the Federal Energy Regulatory Commission) issued a certificate of public convenience and necessity to MRT on July 5, 1979. Accordingly, MRT was empowered to expropriate the property needed for the creation of the storage reservoir by 15 U.S.C. Sec. 717f(h) (1982). See note 2 and accompanying text
 
 
 [6]
 The general expropriation procedure in Louisiana is as follows. Section 30:22 of the Louisiana Revised Statutes requires that before any property is expropriated for use as a gas storage reservoir, the Commissioner of Conservation shall hold a public hearing to determine that the property being expropriated has greater utility as an underground reservoir than for the production of the remaining volumes of natural gas and that at least three-fourths of the property owners have consented to such use; that the reservoir will not contaminate other formations; and that it will not endanger lives or property. La.Rev.Stat.Ann. Sec. 30:22B. (1)-(3) (West 1979). The Commissioner must also determine the amount of commercially recoverable gas and condensate in the reservoir, and may issue orders necessary for the operation of the storage facility. Id., Sec. 30:22 C. & D
 Once the Commissioner has issued an order in accordance with Sec. 30:22, the expropriating authority may institute expropriation procedures in accordance with La.Rev.Stat.Ann. Secs. 19:1 and 19:2. See note 1. The expropriator does not gain the right to use the property until the conditions of each of these statutes is met.
 In the instant case the Louisiana Department of Conservation was empowered to authorize the formation and use of the reservoir under La.Rev.Stat.Ann. Sec. 30:22. The authorization for the reservoir was issued by the Department's Order No. 206-B-2 dated December 21, 1972, and supplemental order dated July 10, 1973, following a public hearing on the matter. MRT did not, however, institute expropriation proceedings against Tabor Jr.'s property at the time the reservoir was created because they failed to discover his recorded mineral interest.
 
 
 [7]
 Under the contract between Tabor Sr. and MRT, MRT was granted the right to inject gas into the Vaughn Sand underlying Tabor Sr.'s property, to withdraw the gas stored within the reservoir without paying royalties or other fees not set forth in the agreement, and to construct surface facilities necessary for the operation of the Reservoir
 The property made subject to the gas storage agreement between MRT and Tabor Sr. contained four tracts, described as follows:
 "FIRST TRACT
 The NE 1/4 of NW 1/4, N 1/2 of NE 1/4, SE 1/4 of NE 1/4, E 1/2 of SE 1/4, SW 1/4 of SE 1/4 and SE 1/4 of SW 1/4, Section 8, less a strip about 10 acres in the SW corner of said Section 8, W 1/2 of SW 1/4 of NW 1/4 of Section 9, and S 1/2 of SE 1/4 of SW 1/4 of Section 5, all in Township 19 North, Range 1 West, AND beginning at the SW corner of the NE 1/4 of NW 1/4, Section 8, Township 19 North, Range 1 West, and run East 730' 4" to the point; from said starting point, run East for 224 feet, then run South 15 degrees 10 minutes West for 164' 6", then run West 186' 8" to the south line of Highway # 44, thence run Northeast along the south line of said highway to starting point, a distance of 100 feet, all in SE 1/4 of NW 1/4, Section 8, Township 19 North, Range 1 West, LESS AND EXCEPT the following:
 Beginning at the SW corner of NE 1/4 of NW 1/4, Section 8, Township 19 North, Range 1 West, and then run East along the South line of NE 1/4 of NW 1/4 a distance of 379 feet to starting point; from said starting point, run NE 164' 6", then run SE 224 feet, then run SW along the West line of State Highway # 44 100 feet, then run West along the South line of NE 1/4 of NW 1/4 a distance of 186' 8" to the starting point. LESS AND EXCEPT A TRACT DESCRIBED AS:
 Beginning at the SW corner of the SE 1/4 of NW 1/4, Section 8, Township 19 North, Range 1 West and run east for a distance of 229 feet for starting point. From starting point run east for a distance of 164.5 feet; thence east to the west line of Ruston-Farmerville Highway, a distance of 145 feet; thence northeasterly along the west line of said highway for a distance of 193 feet; thence west for a distance of 460 feet; thence south to starting point, a distance of 394 feet. All in the SE 1/4 of NW 1/4, Section 8, Township 19 North, Range 1 West, containing (with tract on east side of road) 3.15 acres.
 SECOND TRACT
 Beginning at the NE corner of the SW 1/4 of NE 1/4, Section 8, Township 19 North, Range 1 West and run South to branch, a distance of 551 feet; thence N 65? 00' W for a distance of 815 feet; thence north for a distance of 83 feet to the north line of the SW 1/4 of NE 1/4; thence east along the north line of the SW 1/4 of NE 1/4; thence east along the north line of the SW 1/4 of NE 1/4, to starting point. All in the SW 1/4 of NE 1/4, Section 8, Township 19 North, Range 1 West, containing 4.85 acres.
 THIRD TRACT
 Beginning at the Southwest corner of a tract described as "the East 21.2 acres of W 1/2 of SW 1/4, Section 5, Township 19 North, Range 1 West", and from said starting point run West along the section line 14.7 rods, thence North 160 rods, thence East 24.7 rods, thence South 160 rods back to the starting point, being 24.7 acres located in W 1/2 of SW 1/4, Section 5, Township 19 North, Range 1 West.
 FOURTH TRACT
 A strip of even width containing 3 1/2 acres off the West side of the NE 1/4 of SW 1/4 and off the N 1/2 of SE 1/4 of SW 1/4, Section 5, and the East 21.2 acres of the W 1/2 of SW 1/4, Section 5, all in Township 19 North, Range 1 West, containing in all 24.7 acres. (30-263; 100-435) containing 101.1 acres, more or less.
 Option and Gas Storage Agreement for the East Unionville Storage Reservoir, August 8, 1972.
 
 
 [8]
 See note 1
 
 
 [9]
 See note 2
 
 
 [10]
 At trial, MRT contended that, although no legal expropriation had occurred, Tabor Jr. had consented to or acquiesced in MRT's construction and operation of the reservoir once he became aware of MRT's operations and that in accordance with the St. Julien doctrine, as set forth in La.Rev.Stat.Ann. Sec. 19:14, this acquiesence commenced the running of the two year prescriptive period of Sec. 19:2.1(B). Section 19:14 provides that when an expropriating entity, "in good faith believing it had authority to do so", takes possession of privately owned immovable property and the property owner knowingly consents to or acquiesces in the activities of the expropriating entity, the property owner thereby waives his right to contest the necessity for the taking and is limited to an action for just compensation. This action is subject to the two year prescriptive period of Sec. 19:2.1(B). Brooks v. New Orleans Public Service, Inc., La.Ct.App. 4 Cir., 370 So.2d 686, writ denied, 1979, 373 So.2d 512
 The district court recognized that the requirement of a legal expropriation to commence the running of the prescriptive period set forth in section 19:2.1(B) could be satisfied only if Tabor Jr. had consented to or acquiesced in MRT's use of the Tabor lands for the construction and operation of the storage reservoir. The court found, however, that Tabor, Jr. had never consented to or acquiesced in MRT's activities; therefore, section 19:14 was inapplicable. MRT has not appealed this holding.
 
 
 [11]
 The only exception to this rule is found in the after-acquired title doctrine which provides that when a putative seller later acquires the property he purported to sell, this acquisition will inure to the benefit of the putative purchaser. See e.g. McDonald, 13 So.2d at 715. According to this doctrine, if Tabor Sr. had acquired his son's interest in the property before Tabor Sr. died, MRT, as putative purchaser of the exclusive rights set forth in the gas storage agreement, would have in fact become the owner of those exclusive rights. In the case at bar, however, the putative seller, Tabor Sr., never acquired full ownership; Tabor Jr. did. Tabor Jr. was not the putative seller; therefore, MRT does not receive the benefit of Tabor Jr.'s acquisition of full ownership
 
 
 [12]
 The Louisiana Supreme Court has recently held that, in an expropriation suit filed by the expropriating authority, the defendant property owner may file a counter-claim for any tort damages relating to the property made subject of the expropriation proceedings. State, Through Dept. of Hwys. v. Ellender, La.1980, 379 So.2d 1069, 1072
 
 
 [13]
 But see GMB Gas Corp. v. Cox, La.Ct.App. 2 Cir.1976, 340 So.2d 638, 639-40, which holds that a lessee of a co-owner of a single mineral servitude created before the enactment of the Mineral Code cannot conduct production operations without the consent of the co-owners. As noted by the district court, this holding tends to support Tabor Jr.'s contention that MRT did commit a trespass in conducting its operations without Tabor Jr.'s consent. The facts of the instant case are, however, more analogous to the facts in Cox, in which the surface owner who had reserved an undivided mineral interest was asserting her rights against the owner of the mineral servitude. The Cox court held that in such circumstances, a co-owner of the mineral servitude "owns not half the right to the minerals but the right to half the minerals" underlying the estate. Cox, 421 So.2d at 872
 
 
 [14]
 The Department of Conservation Order provided:
 "All natural gas which previously had been reduced to possession and which subsequently is injected into such underground storage reservoir shall at all times be deemed the property of applicant, its successors and assigns; and in no event shall such gas be subject to the right of the owner of the surface of the lands or of any mineral, mineral royalty or mineral leasehold interest therein under which such underground storage reservoir lies or is adjacent to, or of any person other than applicant, its successors and assigns, to produce, take, reduce to possession, waste or otherwise interfere with or exercise any control thereover."
 
 
 [15]
 Article 1, Sec. 4 of the Constitution of 1974 provides in part that "[p]roperty shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner". La. Const. Art. 1, Sec. 4 (West 1977)
 
 
 [16]
 This section provides:
 "A. In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.
 B. The owner shall be compensated to the full extent of his loss."
 La.Rev.Stat.Ann. Sec. 19:9.
 
 
 [17]
 Bottom hole abandonment pressure is the lowest pressure at which a well will produce in commercial quantities. Calculation of this pressure is necessary to determine the amount of commercially recoverable minerals (recoverable reserves) within a particular field
 
 
 [18]
 See note 14
 
 
 [19]
 The final calculation was made as follows: Waterman calculated a ratio of Tabor Jr.'s acreage within the Calhoun Unit of the Vaughn Sand (30.155) to the total acreage within the Unit. He then multiplied this fraction times the total recoverable reserves found to be contained in the Unit to determine the amount of reserves within Tabor's acreage. He then multiplied this amount times the value of these reserves to determine the total (eight-eights) value of those reserves. This amount was multiplied times one-eighth--the royalty to which Tabor Jr. was entitled under the mineral lease in effect in 1973. This sum was divided by one-half, representing Tabor Jr.'s one-half mineral interest. To this figure was added the value of the storage rights as stipulated to by the parties. The court also awarded legal interest from 1973