**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3700
_____

TENNESSEE GAS PIPELINE COMPANY, LLC

v.

PERMANENT EASEMENT FOR 7.053 ACRES,
PERMANENT OVERLAY EASEMENT
FOR 1.709 ACRES AND TEMPORARY
EASEMENTS FOR 8.551 ACRES IN MILFORD
AND WESTFALL TOWNSHIPS, PIKE COUNTY,
PENNSYLVANIA, TAX PARCEL NUMBERS;
KING ARTHUR ESTATES, A Limited Partnership;
RIOTHAMUS CORP, General Partner of King Estates
c/o Ernest Bertuzzi President; ALL UNKNOWN OWNERS
AND INTERESTED PARTIES

King Arthur Estates, L.P. and Riothamus Corporation,
                                                      Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA
(D.C. No. 3-12-cv-01477)
District Judge: Hon. A. Richard Caputo

_____

Argued
November 28, 2018
_____

Before: AMBRO, CHAGARES, and GREENAWAY, JR.,
*Circuit Judges*.

(Opinion Filed: July 23, 2019)

Albert F. Moran
Patrick F. Nugent
Sean T. O'Neill
John F. Stoviak
Saul Ewing Arnstein & Lehr
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

Elizabeth U. Witmer [Argued]
Saul Ewing Arnstein & Lehr
1200 Liberty Ridge Drive
Suite 200
Wayne, PA 19087
        *Counsel for Appellee*

John T. Stieh [Argued]
Levy Stieh Gaughan & Baron
542 Routes 6 & 209
P.O. Box D
Milford, PA 18337
        *Counsel for Appellants*

_____

OPINION
_____


GREENAWAY, JR., *Circuit Judge*.

The Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717–717z, allows natural gas companies to acquire private property by eminent domain to construct, operate, and maintain natural gas pipelines. *Id.* § 717f(h). Here, Tennessee Gas Pipeline Company, LLC ("Tennessee Gas") commenced a condemnation action under the NGA to acquire easements on property owned by King Arthur Estates, LP ("King Arthur"). On interlocutory appeal, this case now presents us with a single legal issue: whether state law or federal law governs the substantive determination of just compensation in condemnation actions brought by private entities under the NGA. Because federal law does not supply a rule of decision on this precise issue, we must fill the void with a common law remedy. In doing so, we opt to incorporate state law as the federal standard. Accordingly, we will reverse the District Court's order reaching the opposite result.

## I. BACKGROUND

As required by the NGA, Tennessee Gas holds a certificate of public convenience and necessity from the Federal Energy Regulatory Commission ("FERC") authorizing it, *inter alia*, to construct natural gas pipelines in New Jersey and Pennsylvania to augment its natural gas delivery capacity in the region. As part of this project, Tennessee Gas seeks to obtain easements over a 975-acre tract

3

of land in Pike County, Pennsylvania owned by King Arthur. Upon unsuccessfully attempting to purchase the requisite easements from King Arthur, Tennessee Gas filed the instant condemnation action under Federal Rule of Civil Procedure 71.1 ("Rule 71.1").

After the parties stipulated that Tennessee Gas could access and possess the easements, they engaged in discovery pertinent to determining the appropriate compensation for the condemnation. Both parties retained various experts to appraise, *inter alia*, the value of the land before and after the taking, the value of the timber removed from the land, professional fees, development costs, and timber replacement and reforestation costs. Following the close of this discovery, Tennessee Gas moved for summary judgment on various issues, including that of compensation.

As to the issue of compensation, the District Court granted in part Tennessee Gas' motion. Relying entirely on a prior opinion deciding the same issue,[1] the District Court ruled that federal law governs the substantive determination of just compensation in this dispute. The District Court hence

---

[1] That case also concerned a condemnation action brought by Tennessee Gas under the NGA. *Tennessee Gas Pipeline Co. v. Permanent Easement for 1.7320 Acres and Temporary Easements for 5.4130 Acres in Shohola Twp., Pike Cty., Pa.*, No. 11-028, 2014 WL 690700, at *1 (M.D. Pa. Feb. 24, 2014). There, the District Court noted the lack of binding authority on the substantive determination of compensation, discussed persuasive case law on the issue, reviewed the parties' extended arguments on both sides, and, upon doing so, determined that federal law applies. *Id.* at *6–10.

4

determined that, although King Arthur could recover consequential damages for professional fees and development costs under Pennsylvania law, it could not do so under federal law. Together, the consequential damages at issue total just under $1 million.

A few weeks later, King Arthur filed a motion to certify the District Court's order for interlocutory appeal, which the District Court granted. Another Panel of our Court then granted King Arthur's petition for interlocutory appeal. We are now faced with the purely legal question of whether state law or federal law governs the substantive determination of just compensation in condemnation actions brought by private entities under the NGA.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 717f(h). We have appellate jurisdiction under 28 U.S.C. § 1292(b) and review the legal issue presented in this appeal *de novo*. *Geness v. Cox*, 902 F.3d 344, 354 (3d Cir. 2018) (citation omitted); *United States v. Hendricks*, 395 F.3d 173, 176–77 (3d Cir. 2005) (citations omitted).

## III. DISCUSSION

### A. Relevant Law

Before we delve into the merits of the instant issue, we pause to consider the legal landscape in which this dispute arises. In particular, we discuss the background legal principles relevant to (1) the NGA, (2) just compensation,

(3) federal common lawmaking, and (4) persuasive case law on this subject.

## 1. The NGA

It is well-established that the federal government wields the authority to exercise eminent domain. *See Kohl v. United States*, 91 U.S. 367, 370 (1875) ("The right of eminent domain is an 'inseparable incident of sovereignty.'" (citations omitted)). But that is not all. Rather, because "the power of eminent domain is merely the means to the end," the federal government also has the authority to delegate its eminent domain power to private entities. *Berman v. Parker*, 348 U.S. 26, 33 (1954). Indeed, Congress has done so in a number of legislative settings, including the District of Columbia Redevelopment Act of 1945, D.C. Code §§ 5-701 to -737; the Federal Power Act ("FPA"), 16 U.S.C. §§ 824–824w; and, of course, the NGA.

In 1938, Congress enacted the NGA based on its recognition that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest." 15 U.S.C. § 717(a). Acknowledging that "[f]ederal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest," Congress ensured that the NGA delegated regulatory authority to an appropriate body. *Id.* Decades later, this body became FERC. 42 U.S.C. § 7171.

As relevant here, the NGA allows gas companies to acquire private property by eminent domain to construct, operate, and maintain natural gas pipelines. 15 U.S.C. § 717f(h). To do so, however, a natural gas company must first

6

successfully obtain a certificate of public convenience and necessity from FERC and unsuccessfully attempt to purchase the required property from its owner. *Id.* More fully, the NGA provides:

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

*Id.* (emphasis in original).

The statute's reference to state "practice and procedure," however, does not mean that it incorporates state law for the substantive determination of compensation. *Id.* Although some courts have concluded otherwise, *see, e.g.*, *Miss. River Transmission Corp. v. Tabor*, 757 F.2d 662, 665 n.3 (5th Cir. 1985), "this language require[s] conformity in procedural matters only." *United States v. 93.970 Acres of Land*, 360 U.S. 328, 333 n.7 (1959) (citations omitted). In any event, that language has been superseded by Rule 71.1, which establishes its own procedures applicable to all condemnation cases in federal court. *See* Fed. R. Civ. P. 71.1, Advisory Committee Notes (1951) (explaining that the new rule "affords a uniform procedure for all cases of condemnation invoking the national power of eminent domain, and . . . supplants all statutes prescribing a different procedure"); *see also Alliance Pipeline LP v. 4.360 Acres of Land*, 746 F.3d 362, 367 (8th Cir. 2014) (collecting cases).

As a result, the NGA is silent regarding the applicability of state law in condemnation proceedings under the statute. Indeed, the NGA is generally silent on the remedies available in the condemnation proceedings it allows. For example, it does not even expressly require that just compensation be provided.

### 2. Just Compensation

That concept of just compensation originates from the Fifth Amendment: although the federal government has "the authority to take private property for public use by eminent domain . . . [it] is obliged by the Fifth Amendment to provide 'just compensation' to the owner" of the property. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 9 (1984) (citing *Kohl*, 91 U.S. at 371). Under the Fifth Amendment, just

8

compensation generally means "the fair market value of the property on the date it is appropriated" and nothing more. *Id.* at 10; *see also United States v. Miller*, 317 U.S. 369, 374–76 (1943). In other words, in such contexts, "the Constitution has never been construed as requiring payment of consequential damages" like lost profits or development costs. *Miller*, 317 U.S. at 376. This is because "the sovereign need only pay for what it actually takes rather than for all that the owner has lost." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1215 (Fed. Cir. 2005) (quoting *Klein v. United States*, 375 F.2d 825, 829 (Ct. Cl. 1967)).

Thus, in cases involving partial takings, as here, the standard is "the difference between the market value of the entire holding immediately before the taking and the remaining market value immediately thereafter of the portion of property rights not taken." *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990). "If the value of the remaining land, on a unit basis, diminishes when the condemned parcel is removed from the larger whole, the landowner is entitled to compensation 'both for that which is physically appropriated and for the diminution in value to the non-condemned property.'" *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1398 (9th Cir. 1986)); *see also Miller*, 317 U.S. at 376 ("If only a portion of a single tract is taken[,] the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract."). But, if the taking somehow benefits the value of the remaining land, "the benefit may be set off against the value of the land taken." *Miller*, 317 U.S. at 376.

By contrast, Pennsylvania has enacted its own remedial scheme that is applicable to condemnation proceedings that

take place within the state. Similar to federal law, Pennsylvania law defines just compensation as consisting of "the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation and as unaffected by the condemnation and the fair market value of the property interest remaining immediately after the condemnation and as affected by the condemnation." 26 Pa. Cons. Stat. § 702(a).

But fair market value appears to be a more inclusive concept under Pennsylvania law. In contrast to the federal rule regarding partial takings, the recoverable market value under Pennsylvania law appears to include any benefits to the value of the remaining property as a result of the taking. *See id.* § 706(a).

Further, although Pennsylvania law generally defines fair market value as "the price which would be agreed to by a willing and informed seller and buyer," it allows consideration of certain consequential damages within the concept. *Id.* § 703. For example, the relevant law provides that one of the factors for determining fair market value is the "cost of adjustments and alterations to any remaining property made necessary or reasonably required by the condemnation." *Id.* § 1105(2)(v); *see also id.* § 703(4) (stating that considerations for fair market value include factors regarding what evidence may be proffered pursuant to §§ 1101–06).

Pennsylvania law also permits recovery of professional fees such as appraisal, attorney, and engineering fees. *Id.* § 710. The default rule limits such recovery to $4,000. *Id.* § 710(a). But a property owner is entitled to complete reimbursement for those professional fees when the "condemnor attempts to avoid the payment of monetary just

10

compensation to which the [owner] otherwise would be entitled by use of a substitute for monetary compensation and the [owner] incurs expenses" as a result. *Id.* § 716. On the whole, then, Pennsylvania law allows private property owners within the state to obtain more money from condemnors than they could under federal law.

### 3. Federal Common Law

"Federal common law refers to the development of legally binding federal rules articulated by a federal court which cannot be easily found on the face of a constitutional or statutory provision." *McGurl v. Trucking Emps. of N. Jersey Welfare Fund, Inc.*, 124 F.3d 471, 480 (3d Cir. 1997) (citations omitted). The need for common lawmaking "stems from the inability of legislators to anticipate every possible contingency and the impracticability of judges['] returning all unanswered questions to the legislature." *Id.* at 481 (citation omitted). Justice Jackson once explained that federal common law "implements the federal Constitution and statutes[] and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law." *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 472 (1942) (Jackson, J., concurring) (citing *Bd. of Comm'rs v. United States*, 308 U.S. 343, 350 (1939)).

Thus, "when Congress has not spoken 'in an area comprising issues substantially related to an established program of government operation,'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727 (1979) (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593 (1973)), the Supreme Court has "direct[ed] federal courts to fill the interstices of federal legislation 'according to their own

11

standards,'" *id.* (quoting *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367 (1943)).

In crafting such federal common law, however, courts need not "inevitably . . . resort to uniform federal rules." *Id.* at 727–28 (citations omitted). Instead, "[w]hether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *Id.* at 728 (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 310 (1947)).

In *Kimbell Foods*, the Supreme Court addressed the propriety of applying state law under an ambiguous or incomplete federal statute. *Id.* at 718, 723. There, the issue was whether, lacking an express statutory directive, a certain federal loans program needed a uniform federal rule of lien priorities. *Id.* at 718. The Supreme Court answered this question in the negative, holding that state law governed the priority of the liens. *Id.* at 740. In incorporating state law as the federal rule, the Supreme Court employed a three-factor test, considering (1) whether the federal program, by its very nature, required uniformity; (2) whether application of state law would frustrate specific objectives of the federal program; and (3) whether application of uniform federal law would disrupt existing commercial relationships predicated on state law. *Id.* at 728–29.

In light of *Kimbell Foods* and its progeny, where federal law governs a controversy but there is no federal rule of decision on a particular matter, a federal court must fill the void through common lawmaking, either by fashioning a uniform, national rule or by incorporating state law as the federal

12

standard.  Deciding which route to take turns on application of the *Kimbell Foods* factors outlined above.

### 4. Persuasive Case Law

The precise issue before us now is whether state law or federal law governs the measure of just compensation in condemnation proceedings brought by a private entity under the NGA.  Although this is the first time we have considered this issue precedentially,[2] ample other courts have opined on it.  Despite an array of district court decisions on the matter, we focus our attention on seminal opinions from two of our sister circuits: the Fifth Circuit and the Sixth Circuit.

In *Georgia Power Company v. Sanders*, the Fifth Circuit, sitting *en banc*, encountered the same core issue, albeit in an analogous FPA context.  617 F.2d 1112, 1113 (5th Cir. 1980).  The FPA, employing language substantially similar to that in the NGA, allows private entities to use eminent domain to condemn private property in efforts to develop waterways.

---

[2] Another Panel of our Court recently remarked on this issue in a footnote of an unpublished opinion.  *See Columbia Gas Transmission, LLC v. Easement in Washington Cty.*, 745 F. App'x 446, 449 n.4 (3d Cir. 2018) ("Federal law governs the measure of just compensation owed to landowners in condemnation actions under the [NGA]." (citing *United States v. Certain Parcels of Land in Phila.*, 144 F.2d 626, 628–30 (3d Cir. 1944)).  We are not bound by our unpublished decisions and neither party here has cited the case.  In any event, the statement was not necessary to the Court's decision affirming the exclusion of "speculative" expert testimony regarding the "future profitability" of a condemned property.  *Id.* at 450.

*Id.* at 1114 (quoting 16 U.S.C. § 797(e)).  But, like the NGA, it does not prescribe a rule of decision as to the appropriate compensation owed to condemnees.  *Id.* at 1115.

Accordingly, the *Georgia Power* court undertook the federal common lawmaking analysis described above.  As a threshold matter, because the condemnation at issue arose under the FPA, a federal statute, the court determined that the measure of compensation should also derive from a federal source.  *Id.*  Given the statutory gap, the court then turned to *Kimbell Foods* to decide whether to fashion a uniform common law or incorporate state law as the applicable federal rule.  *Id.* (citations omitted).

At the outset, the court noted that "[b]asic considerations of federalism," *id.*, create a "presumption favoring adoption of state law as the federal rule," *id.* at 1116 n.6, "unless it is shown that legislative intent or other sufficient reasons exist to displace state law," *id.* at 1118.  But the court found neither.  *Id.*  Hence, upon determining that the balance of *Kimbell Foods* factors weighed in favor of incorporating state law, the court concluded that "the law of the state where the condemned property is located is to be adopted as the appropriate federal rule for determining the measure of compensation when a licensee exercises the power of eminent domain" under the FPA.  *Id.* at 1124.

The Sixth Circuit reached the same conclusion in *Columbia Gas Transmission Corporation v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1199 (6th Cir. 1992).  There, as here, a natural gas company sought to condemn private property under the NGA, giving rise to the issue of whether state law somehow applies in measuring the appropriate compensation.  *Id.* at 1193–94.  As to the threshold

14

inquiry, the court concluded with "no hesitation" that, since the NGA is a federal statute, its interpretation is a matter of federal law. *Id.* at 1196. Thus, given the NGA's void in prescribing the appropriate compensation, the court turned to *Kimbell Foods*. *Id.* In applying its factors, the court determined that (1) it is unnecessary to fashion a nationally uniform rule of compensation for private parties condemning land under the NGA, (2) incorporating state law as the federal standard would not frustrate the specific objectives of the NGA, and (3) property rights have traditionally been defined by state law. *Id.* at 1198–99. Therefore, the court adopted state law as the federal standard to govern compensation determinations under the NGA. *Id.* at 1199.

## B. Application

Having established the basic legal principles relevant to this dispute, we turn to applying them to the specific facts of this case. As an initial matter, we declare without hesitation that defining the contours of the compensation owed here is an issue of federal law. Indeed, the NGA is a federal statute implementing a nationwide federal program. *Id.* at 1196. As a result, its interpretation is naturally a matter of federal law.

### 1. *Kimbell Foods* Applies Here

Given that conclusion, in order to resort to the *Kimbell Foods* analysis, we must also determine that there exists a gap in the statutory scheme. Here, we do so because (i) *Miller* does not resolve this case, (ii) the NGA does not answer the question at issue, and (iii) the existence of related common law in this domain is of no moment. We explain each in turn.

15

*i.* Miller *Does Not Resolve This Case*

Tennessee Gas' chief argument on appeal is that *Miller* dispositively resolves this case. In ruling in Tennessee Gas' favor at summary judgment, the District Court agreed. We, however, disagree.

In *Miller*, the Supreme Court considered "questions respecting standards for valuing property taken for public use" in relation to the federal government's condemnation of land for the purpose of building railroad tracks. 317 U.S. at 370. Noting that the "measure of compensation" is a "question[] of substantive right . . . grounded upon the Constitution," the Supreme Court rejected the argument that state substantive law should apply to the determination of compensation in that dispute because the federal statutes at issue there only required adoption of state procedural law. *Id.* at 379–80 (citations omitted). The Supreme Court thus held, as relevant here, that federal law—not state law—governs the determination of compensation in eminent domain actions brought by the federal government. *Id.* at 380 (citations omitted).

Over time, *Miller* and its progeny have added content to the federal common law of just compensation. *See, e.g.*, *id.* at 373 (explaining that the condemnee is to be "put in as good position pecuniarily as he would have occupied if his property had not been taken" (citations omitted)); *id.* at 373–74 (defining just compensation to mean the fair market value of the property on the date of the taking); *id.* at 375 (excluding the condemned property's "special value to the condemnor" from the measure of just compensation (citations omitted)); *id.* at 376 (including "severance damage" in the measure of just compensation but excluding "consequential damages" such as the change in value of "separate tracts adjoining that affected

16

by the taking" (citations omitted)); *see also United States v. Bodcaw Co.*, 440 U.S. 202, 203 (1979) (per curiam) (excluding appraisal and attorneys' fees); *United States v. Petty Motor Co.*, 327 U.S. 372, 377–78 (1946) (excluding "loss of profits, damage to good will, the expense of relocation and other such consequential losses" from the measure of just compensation (citations omitted)).

But nothing in *Miller* or its progeny expands its reach to condemnations by private entities. Indeed, *Miller* itself only concerned a condemnation by the federal government. 317 U.S. at 370. We have explicitly recognized this limitation, previously noting that *Miller* announced the standard for determining only "the amount of compensation due an owner of land condemned *by the United States*." *Certain Parcels of Land in Phila.*, 144 F.2d at 629 (emphasis added). Other courts have similarly constrained *Miller* to "condemnation proceedings *brought by the federal government*." *33.5 Acres of Land*, 789 F.2d at 1400 (emphasis added); *see Ga. Power*, 617 F.2d at 1119 & n.10 ("[W]e do not deem [*Miller*] controlling[.]").

Further, Tennessee Gas is unable to muster any binding authority for the proposition that *Miller* applies beyond instances where the federal government is the condemnor. Although it contends that we have "applied federal law in every case involving the determination of compensation in a condemnation pursuant to the federal power of eminent domain," it can only cite cases in which the condemnor was the federal government. Appellee's Br. 16 (emphasis omitted) (citing, *inter alia*, *United States v. 27.93 Acres of Land*, 924 F.2d 506 (3d Cir. 1991); *United States v. 412.93 Acres of Land*, 455 F.2d 1242 (3d Cir. 1972); and *United States v. 60.14 Acres of Land*, 362 F.2d 660, 662, 665 (3d Cir. 1966)). This is also

17

true for the cases from our sister circuits that it cites, allegedly for the broad proposition that these other courts "similarly follow[] *Miller* for federal condemnations." *Id.* at 17–18 (citing *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742 (6th Cir. 2016); *United States v. 2,560.00 Acres of Land, More or Less*, 836 F.2d 498 (10th Cir. 1988); *33.5 Acres of Land*, 789 F.2d 1396; *United States v. 320.0 Acres of Land, More or Less*, 605 F.2d 762 (5th Cir. 1979); *United States v. Certain Prop. Located in Borough of Manhattan*, 344 F.2d 142 (2d Cir. 1965); *United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379 (7th Cir. 1959); and *United States v. Mahowald*, 209 F.2d 751 (8th Cir. 1954)). But, again, none of these cases relying on *Miller* involved a private entity as the condemnor.

That is because no such binding case exists. This makes sense, of course, because the powerful federal interest at play when the federal government is the condemnor is considerably weakened when a private entity is the condemnor. Two independent reasons support our view on this matter.

First, the development of natural gas pipelines is not an "essential governmental function[]." *93.970 Acres of Land*, 360 U.S. at 332 (citation omitted). Long ago, in a condemnation action brought by the federal government to create a post office, the Supreme Court noted that it is "essential" to the federal government's "independent existence and perpetuity" that it be able to "perform its proper functions." *Kohl*, 91 U.S. at 368, 371. Nearly a century later, the Supreme Court reaffirmed that concern, this time ruling that, because the federal government's condemnation of land for naval aviation activities involved "essential governmental functions," federal law, not state law, determined the appropriate remedies for the condemnation. *93.970 Acres of Land*, 360 U.S. at 332–33

18

(citing *Kohl*, 91 U.S. at 371). Here, by contrast, developing natural gas pipelines is not a function—much less an essential function—of the federal government. Accordingly, the federal interest at play here is materially less than if the federal government were pursuing condemnation for an important governmental function.

Second, where the federal government is the condemnor, there exists a significant concern about the spending of federal dollars, one that does not exist when a private entity is the condemnor. Indeed, the federal government has a strong interest in reducing the costs of its own exercises of eminent domain and being subject to different states' compensation regimes may defeat that. *Cf. Edelman v. Jordan*, 415 U.S. 651, 677 (1974) (considering the impact of available relief, albeit in the sovereign immunity context, on government treasuries). However, that concern is not at all in play where, as here, the condemnor is a private entity pursuing the condemnation "for purposes of profit." *Pub. Util. Dist. No. 1 of Pend Oreille Cty. v. City of Seattle*, 382 F.2d 666, 670 (9th Cir. 1967). Because of these two distinct reasons, *Miller* is distinguishable and therefore does not resolve this case.[3]

---

[3] That said, we recognize that *Miller* articulates principles for compensation "grounded upon the Constitution." 317 U.S. at 380. Those principles are thus more properly understood as a constitutional baseline upon which states may allow for more, but not less, compensation for condemnees. Such additional protections by states arise in an array of legal contexts. *See Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (holding that the death penalty is not per se unconstitutional);

19

*ii. The NGA Does Not Answer the Question*

*Miller* aside, the NGA also does not provide a federal rule of decision as to the appropriate compensation owed to condemnees under the statute. As mentioned previously, the NGA does provide that the "practice and procedure" in condemnation actions under the statute must "conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated." 15 U.S.C. § 717f(h). Some courts have concluded that this statutory directive mandates that state law govern the measure of just compensation. *See, e.g.*, *Tabor*, 757 F.2d at 665 n.3. Other courts have read this clause as "raising a strong presumption that state law does provide the proper measure for such determination." *Columbia Gas*, 962 F.2d at 1197. For two reasons, however, this clause is inapplicable here, rendering the NGA silent on the issue of compensation.

First, the clause has been superseded by Rule 71.1, which now "govern[s] proceedings to condemn real and personal property by eminent domain." Fed. R. Civ. P. 71.1(a). As a "law[] in conflict with" a rule of civil procedure, the clause has "no further force or effect." 28 U.S.C. § 2072(b). "As several other courts have observed," then, "Rule 71.1 displaces state procedural law in this condemnation proceeding." *Alliance Pipeline*, 746 F.3d at 367 (collecting cases); *see also S. Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368, 1374 (11th Cir. 1999). Several decades ago, the Supreme Court itself determined that analogous language in another federal statute was "clearly repealed" by a precursor to

*see also* N.J. Stat. Ann. § 2C:11-3b (indicating that New Jersey banned the death penalty in 2007).

20

Rule 71.1. *93.970 Acres of Land*, 360 U.S. at 333 n.7 (1959) (citing 50 U.S.C. § 171).

Second, even if the clause was still in force, it would determine only procedural rules and nothing more. Faced with a similar statutory instruction to try condemnation cases according to "the forms and methods of procedure" provided by state law, *Miller* held that the federal substantive measure of just compensation was unchanged. 317 U.S. at 380 (citing 40 U.S.C. § 258 (1940)). For good reason, then, the First Circuit has expressed "surpris[e]" that "several circuits have read the phrase 'practice and procedure' to encompass state substantive law as well as formal practice." *Portland Nat. Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279, 282 n.1 (1st Cir. 2003). Even the Sixth Circuit, which ultimately applied state law to determine just compensation under the NGA, expressed that the effect of the clause on the substantive measure of just compensation was "arguably open to question." *Columbia Gas*, 962 F.2d at 1197. Accordingly, the NGA does not speak to the appropriate measure of compensation in proceedings under the statute.

### iii. That There Exists a Body of Related Common Law Does Not Matter

Tennessee Gas asserts as a secondary argument that *Kimbell Foods* applies only when no federal common law exists. But we have previously applied the *Kimbell Foods* framework to choose between incorporating state law and applying preexisting federal common law. *See In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1056 (3d Cir. 1993) ("[T]his court already has developed federal common law concerning trusts."). Consistent with this approach, the *Georgia Power*

21

court applied *Kimbell Foods* to decide between state rules of just compensation and the "established body of federal law on the issue." 617 F.2d at 1123 n.17; *cf. Cal. ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283–84 (1982) (noting that federal common law of land accretion already existed in the course of deciding that federal common law, rather than state law, would supply a rule of decision). The *Kimbell Foods* framework is thus not reserved for situations in which federal common law has yet to be fashioned. As a result, we now turn to *Kimbell Foods* to resolve this case.

## 2. State Law Should Be Incorporated as the Federal Standard

Because the source of eminent domain power at issue here is federal, as embodied in the NGA, but neither the statute nor binding precedent specifies a rule of decision in this particular context, the task of "interstitial federal lawmaking" falls upon us. *Ga. Power*, 617 F.2d at 1115 (citing *Little Lake Misere Land*, 412 U.S. at 593). We must now determine whether, in developing a federal standard for just compensation in condemnation proceedings brought by private entities under the NGA, we should fashion a uniform federal rule or instead incorporate state law as the applicable federal rule.

We start with the presumption that state law should be incorporated unless there is an expression of legislative intent to the contrary or a showing that state law significantly conflicts with the federal interest present. *See Kimbell Foods*, 440 U.S. at 739 ("Thus, the prudent course is to adopt the ready[-]made body of state law as the federal rule of decision until Congress strikes a different accommodation." (citations omitted)); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991) ("The presumption that state law should be

22

incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards." (citing, *inter alia*, *Kimbell Foods*, 440 U.S. at 728–29, 39–40)). Here, as explained below, there is neither. We thus presume that state law should be incorporated in this case.

But, even without such a starting presumption, we choose to incorporate state law as the federal rule in this context because the balance of *Kimbell Foods* factors weighs in favor of that. In particular, (i) fashioning a nationally uniform rule is unnecessary, (ii) incorporating state law does not frustrate the NGA's objectives, and (iii) application of a uniform federal rule would upset commercial relationships. We address each factor in turn.

### i. Fashioning a Nationally Uniform Rule is Unnecessary

For five principal reasons, this case does not require a nationally uniform rule. First, the United States is not a party here—or in NGA condemnation proceedings generally—so the federal interest in a nationally uniform rule is relatively weak. The Fifth Circuit, for example, has noted that "the nature of the federal interests involved [where a private entity is the condemnor] differs markedly from the nature of the federal interests involved where the United States is the condemnor." *Ga. Power*, 617 F.2d at 1119–20. So has the Ninth Circuit, recognizing that "[b]y issuance of a license the United States is not acting in the national interest through the licensee to the same extent as it would if it undertook the project itself." *City of Seattle*, 382 F.2d at 669.

23

The Supreme Court has also suggested that whether the federal government is present in a case is important in deciding between state law and federal law. *See Kimbell Foods*, 440 U.S. at 726 ("This Court has consistently held that federal law governs *questions involving the rights of the United States* arising under nationwide federal programs." (emphasis added)). More specifically, the Supreme Court has distinguished between, on the one hand, cases involving the federal government that "generate immediate interests" and therefore warrant federal law and, on the other hand, cases "purely between private parties" that "do[] not touch the rights and duties of the United States" and are thus "far too speculative, far too remote . . . to justify the application of federal law to transactions essentially of local concern." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Parnell*, 352 U.S. 29, 33–34 (1956); *see also Ga. Power*, 617 F.2d at 1117 (citing *Parnell* for the proposition that federal interests are weaker in condemnation actions to which the federal government is not a party).

Second, because property rights are traditionally an area of state concern, the federal interest in a nationally uniform rule for property valuation is especially weak. *See id.* at 1123. A court fashioning a uniform rule of just compensation would not be writing on a blank slate: "far from offering an analytically distinct and self-contained analysis," such a rule "would at best merely superimpose a layer of property right allocation onto the already well-developed state property regime." *Columbia Gas*, 962 F.2d at 1198. Instead of achieving nationwide uniformity, introducing a federal standard for compensation here risks muddying elaborate state property rules.

24

Third, the NGA contemplates state participation in multiple ways, further undermining the case for a nationally uniform rule of compensation in such actions. Most notably, the statute allows licensees to bring condemnation proceedings in state court. 15 U.S.C. § 717f(h) (articulating that private entities may bring condemnation proceedings "in the district court of the United States for the district in which such property may be located, *or in the State courts*" (emphasis added)). Indeed, the NGA requires that the proceedings take place in state court if the amount claimed by the property owner does not exceed $3,000. *See id.* Both the statutory option and mandate to proceed in state court suggest that incorporating state law would not upset any important interest in national uniformity.

But that is not the extent of the NGA's involving states. As another example, the NGA explicitly exempts from its coverage any entities or facilities that receive natural gas for distribution "within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, . . . provided that the rates and service of such [entities] and facilities [are] subject to regulation by a State commission." *Id.* § 717(c). Moreover, the NGA does not prohibit states from regulating natural gas companies involved in interstate activities covered by the statute. We recently held that the "NGA leaves untouched the [states'] internal [environmental] administrative review process[es]" applicable to natural gas facilities, "which may continue to operate as [they] would in the ordinary course under state law," even though the facilities at issue might be part of a larger interstate project. *Twp. of Bordentown, N.J. v. FERC*, 903 F.3d 234, 268 (3d Cir. 2018); *see Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 368 (3d Cir. 2016) (citing

25

15 U.S.C. § 717b(d)). Collectively, these instances of the NGA's explicitly allowing state involvement militate against the need for a nationally uniform rule.

Fourth, to the extent that some nationwide uniformity is needed in NGA condemnation actions, Rule 71.1 provides a sufficient amount of that. Indeed, Rule 71.1 was promulgated precisely "to provide a unified and coherent set of rules and procedures to be used in deciding federal eminent domain actions." *Land, Cullman Cty.*, 197 F.3d at 1375. Further uniformity in substantive property valuation is unnecessary where there is already uniformity in procedure.

Fifth, Tennessee Gas' primary argument in favor of uniformity misses the mark. In particular, Tennessee Gas avers that applying various states' rules on compensation will lead to landowners in different states receiving different payouts from the same pipeline project. But how inequitable this may be is unfortunately of no moment in this analysis. The first *Kimbell Foods* factor is not whether a nationally uniform law would be fairer. Rather, it is whether proper "administration of the federal program[]" requires uniformity. *See Kimbell Foods*, 440 U.S. at 730. Here, that is not the case. As a result, this factor weighs in favor of incorporating state law as the federal rule of decision.

### ii. Incorporating State Law Does Not Frustrate the NGA's Objectives

The second *Kimbell Foods* factor calls for considering whether the incorporation of state law would frustrate specific objectives of the federal program at issue. "[C]onsiderations of federalism militate in favor of adopting state law as the

26

federal rule of decision" unless "state law conflicts significantly with any federal interests or policies." *Nat'l R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1266 (2d Cir. 1987) (citing *Ga. Power*, 617 F.2d at 1116); *see Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966). Because state law would not frustrate the NGA's goals, this factor weighs in favor of incorporating state law as the federal rule of decision.

To begin, we must identify the federal objectives potentially at risk. The NGA declares that the federal interest is in regulating "matters relating to the transportation of natural gas and the sale thereof." 15 U.S.C. § 717(a). Nothing in the NGA suggests that Congress was particularly concerned with protecting natural gas companies from the additional costs that varying state laws may impose, or even with making natural gas companies' transactions streamlined or efficient. Rather, the Supreme Court has articulated that, in enacting the NGA, Congress was instead concerned with protecting the interests of the public, including consumers and property owners. *See Sunray Mid-Continent Oil Co. v. Fed. Power Comm'n*, 364 U.S. 137, 147 (1960) ("[T]he primary aim of the [NGA is] to protect consumers against exploitation at the hands of natural gas companies." (quotations omitted)).

Here, applying Pennsylvania law on just compensation would require Tennessee Gas to pay approximately $1 million more than it is required to pay under federal law. In other words, "[t]he only conceivable effect that adopting state law as the measure of compensation might have" is that "condemnors proceeding under the [NGA] might be required to pay more . . . than under an alternative federal common-law rule." *Columbia Gas*, 962 F.2d at 1198. But we have already identified

27

condemnors' having to pay more than they would otherwise pay under federal law as merely being an "ancillary issue." *In re Columbia Gas*, 997 F.2d at 1058.

That said, a state could theoretically have a compensation law so far out of step with federal law as to create a significant conflict. At oral argument, counsel for Tennessee Gas was only able to muster one case in support of that proposition. *See Nat'l R.R. Passenger*, 822 F.2d at 1265–68. But that case is easily distinguishable from this case.

In *National Railroad Passenger*, the Second Circuit considered, as relevant here, whether to fashion a uniform federal rule or incorporate state law as the rule of decision in determining the appropriate compensation due to a property owner whose land the National Railroad Passenger Corporation ("Amtrak") had condemned. *Id.* at 1262, 1265–66. Applying the *Georgia Power* analysis, which it deemed "sound," *id.* at 1266, the court nonetheless reached a different result: upon concluding that the application of state law would "seriously interfer[e]" with the federal objectives of the intercity rail passenger service program, *id.* at 1266–67, the court opted to fashion a uniform federal rule in lieu of incorporating state law, *id.* at 1266. But the court itself noted a major distinction between the two cases that thus counseled the different result. *Id.* at 1267. In particular, the court explained:

> In *Georgia Power*, moreover, resolving the question of compensation according to state law resulted solely in higher condemnation costs to FPA licensees. That would not be the case here. Under [state] law, a partial taking rendering

28

excess property nonconforming under local zoning laws requires the condemnor to apply for a variance prior to the taking; failing that, the condemnor is to reimburse the owner for the entire parcel and take title in fee simple thereto. We agree with [Amtrak] that application of the state rule of compensation here would place Amtrak in the unenviable position of having either to enmesh itself in the variance procedures of each locality in [the state] where property is sought to be condemned, or to pay for entire parcels irrespective of the nexus between the property so taken and the project necessitating condemnation. Inasmuch as Amtrak is authorized only to condemn property required for intercity rail passenger service, *see* 45 U.S.C. § 545(d)(1)(B), the latter alternative under [state] law conflicts with an express statutory limit on Amtrak's eminent domain power.

*Nat'l R.R. Passenger*, 822 F.2d at 1267.

Here, those considerations are simply not at play. Like the condemnor in *Georgia Power*, Tennessee Gas would only be subject to higher condemnation costs if subjected to state laws on compensation. Pennsylvania compensation law does not entail a complicated variance requirement in which Tennessee Gas would have to "enmesh itself." *Id. National Railroad Passenger* is thus inapposite.

Pressed at length for other examples of "crazy state laws," counsel for Tennessee Gas could not produce any. Oral Arg. Audio 36:03–38:23 (mentioning *Sabal Trail*

29

*Transmission, LLC v. Real Estate*, No. 16-CV-063, 2017 WL 2783995 (N.D. Fla. June 27, 2017), which also only involved potentially higher condemnation costs). In the absence of any further, concrete examples of significantly divergent state laws that could frustrate the NGA's purpose of protecting the public interest, we are unpersuaded by the theoretical possibility that some others may exist. Consequently, this factor also weighs in favor of incorporating state law as the federal rule of decision.

### *iii. Application of a Uniform Federal Rule Would Upset Commercial Relationships*

The third *Kimbell Foods* factor calls for us to consider whether application of a uniform federal rule would upset commercial expectations founded on state law. On the one hand, because there already exists "an established body of federal law on the issue of just compensation" in general, parties that conduct business in this industry are already on notice of the potential application of federal law. *Ga. Power*, 617 F.2d at 1123 n.17 (citation omitted).

On the other hand, "property rights have traditionally been, and to a large degree are still, defined in substantial part by state law." *Columbia Gas*, 962 F.2d at 1198 (citation omitted). Thus, were we to fashion a uniform federal rule, "far from offering an analytically distinct and self-contained analysis," the rule would "merely superimpose a layer of property right allocation onto the already well-developed state property regime." *Id.* Indeed, "when dealing with those powers left to the states, the courts should tread gingerly" in attempting to create a uniform common law. *Ga. Power*, 617 F.2d at 1125 (Fay, J., concurring); *see Nat'l R.R. Passenger*,

822 F.2d at 1267 ("[S]ince state law usually governs the question of what constitutes property, the value of property rights is ordinarily best determined according to state law as well." (internal quotation marks and citation omitted)).

Though the balance is close, we conclude that fashioning a uniform federal common law to determine just compensation in condemnation actions by private entities under the NGA would risk "upsetting the parties' commercial expectations" based upon "the already well-developed state property regime." *Columbia Gas*, 962 F.2d at 1198. Hence, this factor also militates in favor of incorporating state law as the federal rule of decision.

* * *

In sum, we determine that, at the threshold, federal law is the interpretive basis to determine just compensation in condemnation proceedings arising out of the NGA. But, because neither *Miller* nor any other binding authority provides a federal rule of decision as to what constitutes just compensation precisely where a private entity condemns private property under the statute, we turn to *Kimbell Foods*. That case and its progeny reflect a presumption in favor of state law, one not rebutted here. Even without that presumption, however, the *Kimbell Foods* factors collectively weigh in favor of state law because, for the reasons explained previously, (1) fashioning a nationally uniform rule is unnecessary, (2) incorporating state law does not frustrate the NGA's objectives, and (3) application of a uniform federal rule would upset commercial relationships. In light of this analysis, we decide to incorporate state substantive law as the federal standard of measuring just compensation in condemnation

31

proceedings by private entities acting under the authority of the NGA.

## IV. CONCLUSION

For the foregoing reasons, we will reverse the District Court's order and remand this case for further proceedings consistent with this opinion.

Tennessee Gas Pipeline Company, LLC v. Permanent
Easement for 7.053 Acres, Permanent Overlay Easement for
1.709 Acres and Temporary Easements for 8.551 Acres
No. 17-3700

CHAGARES, <u>Circuit</u> <u>Judge</u>, dissenting.

The United States has delegated its eminent domain
power under the Fifth Amendment to natural gas companies in
certain instances pursuant to the Natural Gas Act (the "NGA"
or the "Act"), 15 U.S.C. §§ 717–717z.  The Supreme Court in
<u>United States v. Miller</u>, 317 U.S. 369 (1943), held that federal
substantive law applies to determine just compensation for an
exercise of the eminent domain power under the Fifth
Amendment.  However, <u>Miller</u> featured the Government and
not a private party exercising the Fifth Amendment eminent
domain power.  My learned colleagues cogently explain why
that makes all the difference.  The Supreme Court may well
agree when it considers this legal issue.  Indeed, other courts'
holdings support my colleagues' position.

In my view, however, resolution of the question here
presented begins and ends with the <u>Miller</u> decision.  I believe
that the standard by which we measure just compensation due
for an exercise of the Fifth Amendment eminent domain power
is the same regardless of whether it is the Government or a
Government-delegatee that exercises that power.[1]  Because I

---

[1] Indeed, the only time this Court has passed on the precise
issue presented here, the panel unanimously held that federal
substantive law applies — albeit in a non-precedential
decision.  <u>See</u> <u>Columbia Gas Transmission, LLC v. An</u>
<u>Easement to Construct Operate & Maintain a 20 Inch Gas</u>

1

believe that the Supreme Court's <u>Miller</u> decision controls here and that federal substantive law applies to determine just compensation under the Fifth Amendment, I respectfully dissent.

I.

A.

The Fifth Amendment assures that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.  The eminent domain power belongs to the federal government, but Congress may "delegate[ it] to private corporations, to be exercised by them in the execution of works in which the public is interested."  <u>Boom Co. v. Patterson</u>, 98 U.S. 403, 406 (1878).  As noted by the majority, Congress did just that in the NGA.  <u>See</u> <u>E. Tenn. Nat. Gas Co. v. Sage</u>, 361 F.3d 808, 821 (4th Cir. 2004); <u>S. Nat. Gas Co. v. Land, Cullman Cty.</u>, 197 F.3d 1368, 1372 (11th Cir. 1999).

The NGA recognizes that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."  15 U.S.C. § 717(a).  The Act, under certain conditions, authorizes a natural gas company to acquire "by the exercise of the right of eminent domain" property rights

---

<u>Transmission Pipeline Across Props.</u>, 745 F. App'x 446, 449 n.4 (3d Cir. 2018) ("Federal law governs the measure of just compensation owed to landowners in condemnation actions under the Natural Gas Act.").

necessary "to construct, operate, and maintain a pipe line . . . for the transportation of natural gas." Id. § 717f(h). One of those conditions is that the company hold a certificate of public convenience and necessity, id., which the Federal Energy Regulatory Commission ("FERC") issues when the project "is or will be required by the present or future public convenience and necessity," id. § 717f(e). In other words, the NGA delegates — as here — federal eminent domain power to a natural gas company to promote the construction of a gas pipeline that FERC has determined to be required by public convenience and necessity.

B.

The Supreme Court long ago established that exercises of the federal eminent domain power require the application of federal substantive law regarding just compensation. See Miller, 317 U.S. at 379–80. The Court in Miller addressed issues concerning the just compensation due as a result of the federal government's condemnation of property in California, including whether any increase in value to the land taken due to the Government's proposed action is properly included in the measure of compensation. Id. at 370, 375. Under federal substantive law, the answer was no, but under California law, the answer was yes. Id. at 376–79.

The landowners urged the Court to apply state law by arguing that "Congress ha[d] adopted the local rule followed in the state where the federal court" sat. Id. at 379. The Court declined the invitation, determining that the pertinent statutes required only the adoption of state "forms and methods of procedure," and "d[id] not, and could not, affect questions of substantive right—such as the measure of compensation—

3

grounded upon the Constitution of the United States." Id. at 379–80 (emphasis added). That is, the Supreme Court in Miller held that when the right to compensation is based in the federal Constitution, federal substantive law applies to determine just compensation. Id.

We followed Miller's lead in United States v. Certain Parcels of Land, 144 F.2d 626, 627 (3d Cir. 1944), where we considered whether a pre-taking contract for the sale of property condemned by the United States was admissible to prove the property's market value. The trial court applied Pennsylvania law, which considered the contract inadmissible, and excluded the document. Id. But we held that, according to federal law, the contract should have been admitted because it spoke to "just compensation, affecting the appellant's substantive right, and its relevancy is therefore a federal question to be determined unfettered by any local rule." Id. at 629–30. We have reaffirmed that federal law controls how we measure the federal substantive right of just compensation. See United States v. 13,255.53 Acres of Land, 158 F.2d 874, 876 (3d Cir. 1946) ("This question of substantive right, namely, the measure of compensation, is grounded on the Constitution of the United States and federal law controls."); Kinter v. United States, 156 F.2d 5, 6 (3d Cir. 1946) ("The matter in controversy being the right of compensation of a landowner under the Fifth Amendment, the answers to the questions involved do not depend upon local law."); United States v. Certain Parcels of Land, 145 F.2d 374, 375 (3d Cir. 1944).[2]

---

[2] As the majority recognizes, a body of federal law regarding just compensation already exists. Maj. Op. 21.

4

C.

Miller and our cases interpreting it are clear that when the substantive right to just compensation derives from the Constitution, such compensation is measured according to federal substantive law. One's right to just compensation under the Fifth Amendment is certainly triggered by an exercise of the federal eminent domain power. See, e.g., Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 9 (1984). And Congress may delegate that power to private entities. See Boom Co., 98 U.S. at 406.

These principles lead to the following conclusion: because Congress has authorized natural gas companies to invoke the federal eminent domain power under the NGA, and because exercise of that power entitles a landowner to just compensation under the Fifth Amendment, the question of just compensation in an NGA condemnation action is a question of federal substantive right to which federal substantive law applies.

The landowner ("King Arthur") and the majority disagree, cabining Miller's scope to condemnation actions by the federal government only and adopting the view that the law properly applicable to determining just compensation depends on who is exercising the federal power to condemn property. But the right to just compensation "grounded upon the Constitution of the United States" is a federal substantive right, Miller, 317 U.S. at 380, that is triggered by an exercise of the federal eminent domain power, not necessarily the Government's exercise of that power. And although the Supreme Court in Miller did not explicitly expound that its holding applies to a private party's exercise of the federal

5

power, it did not explicitly limit its reach to the Government's exercise, either.[3]  Its focus was on the condemnee's federal right to compensation.  Miller, 317 U.S. at 379–80.

To carve out a separate set of rules for private parties exercising federal eminent domain power for a federal public purpose under 15 U.S.C. § 717f(h) would create "an artificial wedge between federal condemnations brought by the United States and federal condemnations brought by private entities acting pursuant to congressionally delegated authority."  Tenn. Gas Br. 10; see also Ga. Power Co. v. Sanders, 617 F.2d 1112, 1129 (5th Cir. 1980) (en banc) (Rubin, J., dissenting) (observing that there is no "sound reason to distinguish between condemnation proceedings brought by the United States and those in which it authorizes its power to be used by its statutory licensee for a federal public purpose").[4]  In either

---

[3] The majority reads Certain Parcels of Land as recognizing that Miller applies only to condemnation actions by the Government.  But our statement that Miller "set forth . . . the standard by which the amount of compensation due an owner of land condemned by the United States is to be determined" is merely an acknowledgement that Miller provided law for the same situation we addressed in that case.  Certain Parcels of Land, 144 F.2d at 629.

[4] The majority notes that two other Courts of Appeals have opined on the issue before us.  I do not consider the opinions from those courts to be persuasive.  In reverse chronological order, the Court of Appeals for the Sixth Circuit in Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement, 962 F.2d 1192, 1195 n.4 (6th Cir. 1992), reached its conclusion notwithstanding that the parties apparently agreed that federal common law applied and that neither party

action, the federal eminent domain power is exercised and triggers the constitutional right to compensation.

My colleagues rest their acceptance of this distinction (and Miller's inapplicability) on the conclusion that "the powerful federal interest at play when the federal government is the condemnor is considerably weakened when a private entity is the condemnor." Maj. Op. 17–18. This is so, according to the majority, because "the development of natural gas pipelines is not an 'essential governmental function[,]'" Maj. Op. 18 (quoting United States v. 93.970 Acres of Land, 360 U.S. 328, 332 (1959)), and the "significant concern about the spending of federal dollars" by the Government-

_____

addressed the issue. In addition, the court did not even mention the Supreme Court's Miller decision in its opinion. Similarly, the Court of Appeals for the Fifth Circuit in Mississippi River Transmission Corp. v. Tabor, 757 F.2d 662, 665 n.3 (5th Cir. 1985), also failed to mention Miller in what the Court of Appeals for the Sixth Circuit correctly noted was a "summary treatment of th[e] issue." Columbia Gas, 962 F.2d at 1197. Indeed, the analysis was limited to two sentences in a footnote. The holding of the Tabor court is also problematic in that the court relied solely on the "practice and procedure" clause of 15 U.S.C. § 717f(h) to reach its conclusion — an approach both my colleagues in the majority and I reject. Maj. Op. 19–21. Finally, the Court of Appeals for the Fifth Circuit in Georgia Power, 617 F.2d at 1124, noted how the issue of which law to apply was "a close one" and relied upon (as does the majority) United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979). Insofar as I believe the Supreme Court's decision in Miller controls, we need not conduct the inquiry prescribed by the Kimbell Foods decision.

7

condemnor is missing in eminent domain actions brought by a private party, Maj. Op. 18.[5]  But these concerns are not determinative, in my view.  The Supreme Court's holding in Miller — at least as pertinent to this appeal — did not turn on either concern, but instead on the fact that the substantive right of just compensation was grounded on the United States Constitution.  Miller, 317 U.S. at 380.  In other words, federal law applies to determine the just compensation owed upon an exercise of the federal eminent domain power because the right to just compensation is a federal substantive right, regardless of whether the taking is for an "essential governmental function" or requires the spending of federal dollars.

The majority's final argument to distinguish Miller is likewise unpersuasive.  My colleagues contend that Miller merely sets a constitutional floor for just compensation and that states may, through their own laws, provide for greater compensation for landowners.  Assuming that that observation is correct, it still does not explain why Miller does not apply here, a federal condemnation proceeding.  That states may provide landowners more generous compensation (under state law) is immaterial.

Because I view the Supreme Court's decision in Miller as controlling, I would affirm the District Court's application of federal substantive law to determine just compensation under the Fifth Amendment.

---

[5] King Arthur also argues that Miller is inapplicable because there, unlike here, private property was taken for a public use.  The majority does not appear to accept King Arthur's assertion that its land was not taken for a public use, and neither do I.

8

## II.

For the above reasons, I respectfully dissent.